**EMMIS PUBLISHING CORPORATION,**
Petitioner,

v.

**INDIANA DEPARTMENT OF STATE
REVENUE, and Kenneth L. Miller, in
his Capacity as Commissioner of the
Indiana Department of State Revenue,
Respondents.**

No. 49T05–9011–TA–00059.

Tax Court of Indiana.

April 8, 1993.

Stephen H. Paul, Edwin W. Free, Baker & Daniels, Indianapolis, for petitioner.

Pamela Carter, Atty. Gen., Marilyn S. Meighen, Deputy Atty. Gen., Indianapolis, for respondents.

FISHER, Judge.

The Petitioner, Emmis Publishing Corporation (Emmis), appeals the final determination of the Respondent, the Indiana Department of State Revenue (the Department), denying the refund of state gross retail (sales) tax[1] paid for the years 1987, 1988, 1989, and the period from January 1, 1990, through June 30, 1990. The matter is before the court on the parties' motions for summary judgment.

### ISSUES

The parties raise several issues which the court restates as follows.

I. Does 45 I.A.C. 2.2–5–26(b)(2) unconstitutionally discriminate on the basis of the content of speech for purposes of exemption from sales tax, and, if so, what is the proper remedy for such discrimination?

II. Is *Indianapolis Monthly* a newspaper for purposes of exemption from sales tax under IND.CODE 6–2.5–5–17?[2]

III. Is Emmis is entitled to relief under 42 U.S.C. § 1983?

---

1. IND.CODE 6–2.5–1–1 *et seq.*

2. Contingent on the court's ruling that *Indianapolis Monthly* is not a newspaper for purposes of exemption under IC 6–2.5–5–17, the Department's motion for summary judgment also seeks judgment on whether Emmis's rights to procedural and substantive due process and equal protection under the United States Constitution and corresponding provisions of the Indiana Constitution have been violated. Because the court's disposition of the Department's summary judgment motion does not resolve whether *Indianapolis Monthly* is a newspaper, the court does not at this time reach these additional constitutional issues. *See Indiana Educ. Employment Relations Bd. v. Benton Community School Corp.* (1977), 266 Ind. 491, 365 N.E.2d 752 (constitutional issues reached only when necessary); *see also Passwater v. Winn* (1967), 248 Ind. 404, 229 N.E.2d 622; *Harlan Sprague Dawley, Inc. v. Indiana Dep't of State Revenue* (1992), Ind.Tax, 605 N.E.2d 1222, 1232 (*Harlan Sprague Dawley II*).

## FACTS

The following facts are undisputed. For most of the years at issue Mayhill Publishing Co., Inc. (Mayhill) published and distributed *Indianapolis Monthly*. Emmis purchased the assets *Indianapolis Monthly* from Mayhill in August of 1988 and has published *Indianapolis Monthly* since that date. Both Mayhill and Emmis collected and remitted sales tax on subscription sales of *Indianapolis Monthly* during the years at issue totaling $56,820.41. Emmis returned $61.24 of the previously collected sales tax to certain subscription customers and seeks a refund from the Department. With the exception of this small amount, Emmis continues to collect and remit sales tax to the Department on subscription sales of *Indianapolis Monthly*. Additional facts are introduced below as necessary.

## DISCUSSION AND DECISION

### I.

### STANDARD OF REVIEW AND RELEVANT LAW

■ The court begins with the familiar standard that summary judgment may be granted if no genuine issue of material fact exists and a party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C). Indiana imposes a sales tax on retail transactions made in Indiana. IND.CODE 6–2.5–2–1. "Sales of newspapers are exempt from [sales] tax." IC 6–2.5–5–17 (the newspaper exemption). Emmis does not challenge the constitutionality of the newspaper exemption in its motion for summary judgment. Rather, the catalyst setting off the parties' dispute is the Department's regulation addressing the newspaper exemption, which provides:

(a) General Rule. In general, sales of all publications irrespective of format are taxable. The exemption provided by this rule *[45 IAC 2.2]* is limited to sales of newspapers.

(b) Application of the general rule. For purposes of [sales] tax, the term 'newspaper' means only those publications which are:

(1) commonly understood to be newspapers;

(2) *published for the dissemination of news of importance and of current interest to the general public, general news of the day, and information of current events;*

(3) circulated among the general public;

(4) published at stated short intervals;

(5) entered or are qualified to be admitted and entered as second class mail matter at a post office in the county where published; *and*

(6) printed for resale and are sold.

(c) Publications which are primarily devoted to matters of specialized interest such as business, political, religious, or sporting matters may qualify for exemption if they also satisfy the criteria listed in subsection 26 of this rule *[subsection (b) of this section]*.

(d) Magazines, periodicals, journals, bulletins, advertising supplements, handbills, circulars, or the like are not newspapers until distributed as a part of a publication which is a newspaper within the meaning of this rule *[45 IAC 2.2]*.

(1) Magazines are not construed to be newspapers. The retail sales of all magazines and periodicals are subject to sales tax. The sale of magazines by subscription is subject to sales tax without regard to the price of a single copy, and sales tax must be collected by the seller from the person who subscribes to the magazine on the full subscription price.

(2) For purposes of [sales] tax, the term 'newspaper' shall include advertising inserts. Advertising inserts shall mean only those publications which are:

(A)(i) produced for a person by a private printer and delivered to the newspaper publishers, or

(ii) produced and printed by a newspaper publisher, or

(iii) produced and printed by a person and delivered to the newspaper publisher, and

(B) inserted by the newspaper publisher into the newspapers and distributed along with the newspapers.

Any distribution not meeting the above test does not qualify for the newspaper insert exemption. Examples of items distributed along with a newspaper that do not qualify for the exemption include: gum, shampoo, and detergent samples.

(e) Publications issued monthly, bimonthly, or at longer or irregular intervals are generally not considered to be newspapers.

(f) Racing forms and tip sheets are not newspapers.

(g) A preponderance of advertising, lack of authorization to carry legal advertising, or lack of a masthead setting forth the publisher, editor, circulation, and place of publication are characteristics of publications other than newspapers.

45 I.A.C. 2.2–5–26 (emphasis added).

In its motion for summary judgment, Emmis contends the criteria to determine whether a publication is a newspaper under subsection (b)(2), emphasized above, discriminate on the basis of the content of speech in violation of the First and Fourteenth Amendments to the United States Constitution and Article 1, § 9 of the Indiana Constitution. The court agrees.

" 'The liberty of the press is indeed essential to the nature of a free state,' " J. Nowak, R. Rotunda, J. Nelson, *CONSTITUTIONAL LAW* 886 (2d ed. 1983) (quoting 2 T. Cooley *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 886 (8th ed. by W. Carrington 1927)), and the First Amendment provides restraints on government in regulating the press. "Clearly, the First Amendment does not prohibit all regulation of the press. It is beyond dispute that the States and the Federal government can subject [the press] to generally applicable economic regulations without creating constitutional problems." *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue* (1983), 460 U.S. 575, 581, 103 S.Ct. 1365, 1369, 75 L.Ed.2d 295, 302. Taxation of the press may, however, implicate the concerns of the First Amendment when it "is directed at, or presents the danger of suppressing, particular ideas." *Leathers v. Medlock* (1991), — U.S. —, —, 111 S.Ct. 1438, 1447, 113 L.Ed.2d 494, 507–08. For example, in *Grosjean v. American Press Co.* (1936), 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660, the Supreme Court struck down a Louisiana tax that was deliberately calculated to limit the circulation of information by certain publishers.

The Supreme Court has also articulated three circumstances in which a tax upon the press will run afoul of the First Amendment, regardless of the legislature's good or bad motives.[3] First, a tax that singles out the press for differential treatment is presumptively unconstitutional. *See Minneapolis Star,* 460 U.S. at 585, 103 S.Ct. at 1372, 75 L.Ed.2d at 305. Second, selective taxation of the press that targets a "small group" of members of the press or singles out a "few members" of the press may offend the First Amendment.[4] *Id.* at 591–92, 103 S.Ct. at 1375, 75 L.Ed.2d at 308–09. And third, "for reasons that are obvious, a tax will trigger heightened scrutiny under the First Amendment if it discriminates on the basis of the content of speech." *Leathers,* at —, 111 S.Ct. at 1444, 113 L.Ed.2d at 504.

In *Arkansas Writers' Project,* the Supreme Court examined the constitutionality

---

**3.** "Illicit legislative intent is not the sine qua non of a violation of the First Amendment." *Minneapolis Star,* at 592, 103 S.Ct. at 1376, 75 L.Ed.2d at 309.

**4.** The Supreme Court has not placed precise parameters on the number of taxpayers required to constitute a "small group" or a "few" in determining targeted taxation structures. The Supreme Court, however, held that targeted taxation resulted in *Minneapolis Star,* when the tax was structured so that only 11 publishers paid the tax and also in *Arkansas Writers' Project, Inc. v. Ragland* (1987), 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209, when one, or at most three, publishers paid tax. In *Leathers,* the Supreme Court declined to extend the target taxation doctrine to a sales tax scheme that burdened some 100 cable television systems. *Leathers,* at —, 111 S.Ct. at 1447, 113 L.Ed.2d at 508.

of an Arkansas sales tax scheme that exempted sales of newspapers and certain types of magazines. The exemption of magazines was dependent on content, and " 'religious, professional, trade and sports journals' " were exempt.[5] *Arkansas Writers' Project*, 481 U.S. at 224, 107 S.Ct. at 1725, 95 L.Ed.2d at 216 (quoting Ark.Stat. Ann. § 84–1904(j)). The *Arkansas Times*, a general interest monthly publication, was neither a newspaper nor a religious, professional, or trade publication; consequently, it objected to the denial of an exemption on First Amendment grounds. The Supreme Court agreed the Arkansas exemption scheme was unconstitutional because it discriminated among magazines on the basis of content. "[T]o determine whether a magazine is subject to the sales tax, Arkansas' 'enforcement authorities must necessarily examine the content of the message that is conveyed....' " *Id.* 481 U.S. at 230, 107 S.Ct. at 1728, 95 L.Ed.2d at 220 (quoting *FCC v. League of Women Voters of California* (1984), 486 U.S. 364, 383, 104 S.Ct. 3106, 3119, 82 L.Ed.2d 278).

> '[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.' *Police Dept. of Chicago v. Mosley* [1972], 408 U.S. [92], at 95, 92 S.Ct. [2286], at 2289 [33 L.Ed.2d 212]. *See also Carey v. Brown* [1980], 447 U.S. [455], at 462–463, 100 S.Ct. [2286], at 2291 [65 L.Ed.2d 263]. 'Regulations which permit the government to discriminate on the basis of content of the message cannot be tolerated under the First Amendment.' *Regan v. Time, Inc.*, 486 U.S. 641, 648–649, 104 S.Ct. 3262, 3266–3267, 82 L.Ed.2d 487 (1984).

*Id.* 481 U.S. at 229–30, 107 S.Ct. at 1728, 95 L.Ed.2d at 220.

Turning to the case at bar, 45 I.A.C. 2.2–5–26 is drafted so that a publication must meet each of six requirements under subsection (b) to be a newspaper. Subsection (b) begins with the limitation that "the term 'newspaper' means only those publications which are ..." and then conjunctively sets forth the six requirements. Among these is subsection (b)(2), which states a publication must be "published for the dissemination of news of importance and of current interest to the general public, general news of the day, and information of current events." Moreover, the Department does not argue that its regulation is applied so that the criteria under subsection (b)(2) are not requisites for exemption; rather, it claims the requirements of subsection (b)(2) are not focused on content. *Brief in Support of Revenue's Motion for Summary Judgment* at 20. This reading of subsection (b)(2), however, is too generous. The scrutiny of content required by 45 I.A.C. 2.2–5–26(b)(2) is incompatible with the purposes of the First Amendment.

To support their positions, the parties cite recent cases from other jurisdictions indicating a divergence of authority concerning the constitutionality of the application of exemptions from sales taxes for newspapers that distinguish among publications based upon their news content. The court, therefore, considers these cases.

In *Department of Revenue v. Magazine Publishers of America, Inc.* (1992), Fla., 604 So.2d 459 (*Magazine Publishers of America II*), the Florida Supreme Court addressed a sales tax scheme that exempted sales of newspapers and secular magazines.[6] The Florida Supreme Court struck

---

**5.** The relevant magazine exemption statute also stated that it applied to "publications printed within [Arkansas] ... when sold through regular subscriptions." *Arkansas Writers' Project*, at 224, 107 S.Ct. at 1725, 95 L.Ed.2d at 216 (citing Ark.Stat.Ann. § 84–1904(j)). The Arkansas Supreme Court, however, construed the exemption as applying only to magazines that were "religious, trade, or sports periodical[s]." *Id.* at 226, 107 S.Ct. at 1726, 95 L.Ed.2d at 217 (quoting 287 Ark. 155, 157, 697 S.W.2d 94, 95).

**6.** The Florida Supreme Court first addressed the sales tax scheme in *Department of Revenue v. Magazine Publishers of America, Inc.* (1990), Fla., 565 So.2d 1304 (*Magazine Publishers of America I*), and decided Florida's statutory exemption for magazines was unconstitutional because it treated some periodicals (nonsecular magazines) less favorably than others, and thus, targeted the tax to a "few" taxpayers. *Magazine Publishers of America I*, 565 So.2d at 1307–08. The decision did not, however, specify the number of magazines subject to the tax. As the case

down the sales taxation scheme due to a regulation which defined the term "newspaper," in part, by content. In holding the regulation constituted a constitutionally impermissible classification scheme, the court reasoned:

> In reviewing a publication, the Department is guided by Florida Administrative Code Rule 12A–1.008(1)(b) which specifies that '[i]n order to constitute a newspaper, the principal purpose of the publication must be to disseminate news.' The rule also provides that the publication must meet five enumerated elements in order to constitute a newspaper. While most of these elements relate to the form or frequency of publication, the fifth element *requires the Department to evaluate the contents of the publication to determine whether it contains 'reports of current events and matters of general interest which appeal to a wide spectrum of the general public.'* Fla.Admin.Code R. 12A–1.0008(1)(b)5. *This is not a content-neutral requirement.*

*Magazine Publishers of America II*, 604 So.2d at 462 (emphasis added) (footnotes omitted).

The Tennessee Supreme Court took the same trail in deciding the companion cases of *Newsweek, Inc. v. Celauro* (1990), Tenn.; 789 S.W.2d 247, *cert. denied*, (1991), —— U.S. ——, 111 S.Ct. 1639, 113 L.Ed.2d 734, and *Southern Living, Inc. v. Celauro* (1990), Tenn., 789 S.W.2d 251, *cert. denied*, (1991), —— U.S. ——, 111 S.Ct. 1639, 113 L.Ed.2d 734. These cases involved the Tennessee sales and use tax which, like Indiana's and Florida's tax schemes, exempted newspapers but subjected other types of publications to tax. The Tennessee Department of Revenue's regulation required, among other things, that to quali-

fy as a newspaper a publication "must contain matters of general interest and reports of current events." Like the court in *Magazine Publishers of America II*, the Tennessee Supreme Court found "[t]his is not a content-neutral requirement." *Newsweek*, 789 S.W.2d at 249.

On the other hand, in *Hearst Corp. v. Iowa Department of Revenue and Finance* (1990), Iowa, 461 N.W.2d 295, *cert. denied*, (1991), —— U.S. ——, 111 S.Ct. 1639, 113 L.Ed.2d 735, the Iowa Supreme Court upheld a sales tax scheme that applied a newspaper exemption based upon a regulation that included references to content in defining the term "newspaper." The Iowa regulation stated:

> A newspaper is defined as a paper that is printed and distributed daily, weekly, or at some other regular and usually short interval *and that generally* contains news, articles of opinion (editorials), features, advertising, or other matter regarded as of current interest. 701 Iowa Admin Code 18.42(1) (1981) (amended 1982 striking 'generally' from definition).

*Hearst*, 461 N.W.2d at 300 (emphasis added). Critical to the reasoning of the *Hearst* case is the scope of judicial review and the basis for the Iowa Department of Revenue's denial of exemption.

> The administrative agency ... found the Hearst publications in question to be different from newspapers in that they were printed monthly or bimonthly. They were more costly, had a substantially longer useful life than newspapers, and targeted a smaller audience that was interested in a specific subject matter. Also their format was different as was the paper used in its printing.

We agree that the administrative agency had *substantial evidence* to support its finding based on *these* facts and the

was decided prior to the United States Supreme Court's decision in *Leathers*, which found a sales tax scheme burdening some 100 cable television systems was not targeted, the United States Supreme Court granted certiorari, vacated, and remanded the matter to the Florida Supreme Court for consideration in light of *Leathers*. *Miami Herald Publishing Co. v. Department of State Revenue* (1991), —— U.S. ——, 111 S.Ct. 1614, 113 L.Ed.2d 712. On remand the

Florida Supreme Court retracted its position that only a "few" magazines were targeted by the Florida sales tax scheme. *Magazine Publishers of America II*, 604 So.2d at 461 ("Magazine Publishers of America, Inc. is 'a national trade association comprised of 213 publishers' and ... '[m]ost, if not all, of these publishers sell magazines and other publications....'"). *Compare* note 4, *supra*.

ordinary meaning of these terms that Hearst publications are properly characterized as 'magazines' or 'periodicals' and not 'newspapers.' To classify the Hearst publications as 'newspapers' would be to place a strained, impractical or absurd construction upon the language of the statute.

*Id.* (emphasis added) (citation omitted). The court noted the Iowa regulation was based upon a dictionary definition of "newspaper" and the common understanding of this term, both of which are based, in part, upon the content of publications. The court, however, relied on administrative findings that distinguished the Hearst publications upon content-neutral bases.

We observe that although a publication may contain some of the noncontent criteria that distinguish a 'newspaper' from other publications that are taxable, it may still not qualify under the 'newspaper' exemption. Our review of the facts of this case points to this conclusion.

The agency properly found numerous differences between the Hearst publications at issue and newspapers based on noncontent factors, as herein enumerated.

*Id.* at 301.

Hearst also argued the taxation scheme was facially invalid because it was based upon the content of a publication. The court, however, found little merit in that argument. *Id.* at 303.

While the classification of the writing as 'news, articles of opinion (editorials), features, advertising, or other matter regarded of current interest' is a consideration, the focus is not on the content of the journalism. Rather the form and frequency of the publication are the primary factors for determining whether a publication qualifies for the Iowa sales and use tax exemption.... The Iowa

law does not scrutinize the content, but rather the form and frequency of publication.

*Id.*

Unlike the regulation in the *Hearst* case, 45 I.A.C. 2.2–5–26(b)(2) requires a publication to meet content-based criteria to be considered a newspaper for purposes of exemption.[7] Moreover, this court applies a de novo standard of review over the Department's determinations. IND.CODE 6–8.1–9–1(d); *Hoosier Energy Rural Elec. Coop., Inc. v. Indiana Dep't of State Revenue* (1988), Ind.Tax, 528 N.E.2d 867, 869, *aff'd*, (1991), Ind., 572 N.E.2d 481, *cert. denied*, (1991), —— U.S. ——, 112 S.Ct. 337, 116 L.Ed.2d 277.

Finally, in *Gallacher v. Commissioner of Revenue Services* (1992), 221 Conn. 166, 602 A.2d 996, the publisher of *T.V. Facts* argued it was entitled to a newspaper exemption from Connecticut use tax. The fact pattern in *Gallacher* differs from the cases discussed above in that Connecticut statutes exempt newspapers from the use tax, *Gallacher*, at 167, n. 1, 602 A.2d at 998, n. 1, but neither Connecticut's statutes nor its administrative regulations define the term "newspaper." Rather, the definition is based on case law. *Id.* at 172–73, 602 A.2d at 1000–01. Moreover, the *Gallacher* court drew a distinction between discrimination based upon the viewpoint or content of a publication and discrimination based upon the "type of material":

An examination of the format of the plaintiffs' publications reveals that they do not fit within the common understanding of what one would envision as a newspaper. Although the plaintiffs' publications contain some 'features' as well as television listings, they do not 'routinely report a myriad of topics' as contemplated by the test in *Caldor, Inc. [v. Heffernan* (1981), 183 Conn. 566, 440

---

7. In *Hearst,* the court implied that the content-based criteria within Iowa's regulation were not a necessary basis for distinguishing newspapers. On the contrary, in *Newsweek* and *Southern Living,* the court found Tennessee's regulation required that publications meet content-based criteria to qualify as newspapers. The United States Supreme Court denied certiorari on both

the *Hearst* case and the companion Tennessee cases, *Newsweek* and *Southern Living,* on the same day. *See* —— U.S. ——, 111 S.Ct. 1639, 113 L.Ed.2d 734. The inference from the denials of certiorari, if any, is that content-based criteria are not fatal if they are not necessary to classify publications for exemption.

A.2d 767], and certainly do not contain what is generally thought to be news....

The trial court concluded that the plaintiffs' 'publications were not 'newspapers' within the meaning of that term as used in [the statute].' For that conclusion the court cited *Caldor, Inc. v. Heffernan, supra,* 183 Conn. at 570–71, 440 A.2d 767, and an annotation in 25 A.L.R.4th 750, entitled 'What constitutes newspapers, magazines, and periodicals, or the like, under sales or use tax law exemption.' A review of those citations clearly reveals that the trial court based its decision not on the content of the plaintiffs' publications but rather the absence of most of the features usually found in newspapers. Neither *Caldor, Inc.,* nor the cases cited in 25 A.L.R.4th 750, *discuss the content or viewpoint of any material that appears in any publication but rather discuss the type of material, regardless of its content or viewpoint, that must appear in a publication to have it constitute a newspaper. For example, a universal requirement for a newspaper is that it contain news.*

Clearly, the trial court determined that 'TV Facts' lacked essential ingredients in its *form* to constitute a newspaper under the statute. There is certainly no indication that it based its conclusion *on the content or viewpoint of any material* that appeared in the plaintiffs' publications. In fact a discussion of the content of any of the material that appeared in 'T.V. Facts' is conspicuous by its absence. The trial court simply found differences between the plaintiffs' publications and what is ordinarily understood to be a newspaper based on noncontent factors. *Hearst Corporation v. Iowa Department of Revenue and Finance,* 461 N.W.2d 295, 301 (Iowa 1990).

*Id.* at 175–77, 602 A.2d at 1002–03 (emphasis added). This court, however, finds unpersuasive the distinction between the content or viewpoint of material on the one hand, and the "type of material" on the other, to determine whether a particular "type of material" constitutes "news of importance and of current interest to the general public, general news of the day, and information of current events" as required by 45 I.A.C. 2.2–5–26(b)(2).

## FIRST AMENDMENT SCRUTINY

■ Having found 45 I.A.C. 2.2–5–26(b)(2) requires the Department to determine whether a publication is a "newspaper" based upon its content, the court must determine whether the differential taxation of publications withstands heightened scrutiny under the First Amendment. "[T]o justify such differential taxation, the [Department] must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Arkansas Writers' Project,* 481 U.S. at 231, 107 S.Ct. at 1729, 95 L.Ed.2d at 221.

The Department advances two interests in support of content-based distinction in defining newspapers. First, the Department contends the newspaper exemption is a form of subsidy that makes available inexpensive sources of news, thus, enhancing the knowledge and literacy of the public. Although a knowledgeable and literate public is a laudable goal, the exemption of other publications, not commonly thought of as newspapers, *e.g.,* magazines, might also foster knowledge and literacy through inexpensive news sources. Accordingly, the Florida Supreme Court rejected a similar argument in *Magazine Publishers of America II:*

> The Department argues that the newspaper exemption furthers the compelling state interest of encouraging the literacy and general knowledge of Florida's citizens. Although the State has a legitimate interest in fostering literacy, ... [t]he State need not look to the content of publications to attain the desired goal of increased public knowledge and literacy. Moreover, magazines and other publications not eligible for the exemption also provide a wealth of information to the public.

*Magazine Publishers of America II,* 604 So.2d at 462–63.

In the same vein, the United States Supreme Court noted in *Arkansas Writers' Project* that the state's interest in fostering communication would be served "by a blanket exemption of the press from the sales tax, [but] cannot justify the selective taxation of certain publishers." *Arkansas Writers' Project*, 481 U.S. at 232, 107 S.Ct. at 1729, 95 L.Ed.2d at 221. Furthermore, the undisputed facts demonstrate the current newsstand price of *Indianapolis Monthly* is $2.25, a price less than that charged for some publications qualifying as "newspapers" under 45 I.A.C. 2.2–5–26. *Paul Affidavit of September 28, 1992* at ¶¶ 10–11; *Haycox Affidavit* at ¶ 2. Accordingly, the Department's taxation scheme is not narrowly tailored toward achieving the desired goal of subsidizing inexpensive sources of news.

The second interest the Department advances in support of its taxation scheme is the administrative economy occasioned by the exemption of newspapers. That is, the Department, by virtue of the newspaper exemption, is relieved of the administrative burden and expense of regulating hundreds of newspaper carriers in the collection and remittance of sales tax. Though administrative economy is a legitimate aim of government, *see Hearst*, 461 N.W.2d at 306, "a state's stake in orderly administration and efficient tax collection is not an interest separate and distinct from that in raising revenue." *Dow Jones & Co. v. State ex rel. Oklahoma Tax Comm'n* (1990), Okl., 787 P.2d 843, 847. The interest of raising revenue "does not explain the selective imposition of ... sales tax on some [publications] and not others, based ... on their content." *Arkansas Writers' Project*, at 231, 107 S.Ct. at 1729, 95 L.Ed.2d at 221. *See also Minneapolis Star*, 460 U.S. at 586, 103 S.Ct. at 1372, 75 L.Ed.2d at 305; *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd.* (1991), —— U.S. ——, ——, 112 S.Ct. 501, 510, 116

L.Ed.2d 476, 489. The court therefore finds the content-based distinction among publications in 45 I.A.C. 2.2–5–26(b)(2) is neither necessary to serve a compelling state interest nor narrowly drawn to achieve that end.

## REMEDY

■ The parties hotly contest the proper remedy to cure the ills of the content-based criteria within 45 I.A.C. 2.2–5–26(b)(2). Emmis argues the court should extend newspaper exemption to *Indianapolis Monthly*. The proper remedy, however, is provided by the invalidation of subsection (b)(2).

IC 6–2.5–5–17 states only that "[s]ales of newspapers are exempt from [sales] tax," and it does not require the Department to define the term "newspaper" using the content-based criteria within 45 I.A.C. 2.2–5–26(b)(2). Moreover, the statute "is clothed with the presumption of constitutionality," *Sidle v. Majors* (1976), 264 Ind. 206, 209, 341 N.E.2d 763, 766, and the Department's incorrect interpretation under subsection (b)(2) is entitled to no weight. *Johnson County Farm Bureau Coop. Ass'n v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 568 N.E.2d 578, 586, *aff'd*, (1992), Ind. 585 N.E.2d 1336 (citing *Lake County Beverage Co. v. 21st Amendment, Inc.* (1982), Ind.App., 441 N.E.2d 1008, 1014).

The court need not invalidate all of 45 I.A.C. 2.2–5–26 because the Department's general tax administration regulations contemplate the partial invalidation of regulations when the court's interpretation of underlying statutory authority conflicts with a regulation.[8] "An interpretation of the statutory provisions governing the listed taxes, made by a court of competent jurisdiction, which conflicts with rules promulgated by the department, will render that rule, or portion of a rule, null and void...."[9] 45 I.A.C. 15–3–2(b). Accord-

---

**8.** Although the regulations for administering the sales tax under Article 2.2 of Title 45 do not include a severance provision, some of the articles within the Department's regulations contain specific severance provisions. *See, e.g.,* 45 I.A.C. 1–1–230 (severance of gross income tax

regulations); 45 I.A.C. 4–6–7 (severance of inheritance tax regulations).

**9.** The state gross retail (sales) tax is included among the "listed taxes" under IND.CODE 6–8.1–1–1.

ingly, the court deems subsection (b)(2) null and void in determining whether publications constitute newspapers under IC 6–2.5–5–17 [10] and GRANTS summary judgment in favor of Emmis on the issue of whether subsection (b)(2) unconstitutionally discriminates on the basis of the content of speech.

## II.

### APPLICATION OF NEWSPAPER EXEMPTION

■ In its motion for summary judgment, the Department contends *Indianapolis Monthly* is not a newspaper under IC 6–2.5–5–17. The construction of the meaning of the term "newspaper" within this statute is a question of law for the court to determine. *See Caylor–Nickel Clinic, P.C. v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 569 N.E.2d 765, 767, *aff'd,* (1992), Ind., 587 N.E.2d 1311, (quoting *Indianapolis Historic Partners v. State Bd. of Tax Comm'rs* (1990), Ind.Tax, 563 N.E.2d 1345, 1347). Whether a particular publication comes within the court's construction of the term "newspaper," however, is a question of fact. *See United States v. Kelly* (6th Cir.1964), 328 F.2d 227, 236–37 (holding that a racing finger sheet, the *Louisville Daily Sports News,* fell "within the ambit of 'any newspaper or similar publication' and was, therefore, exempt from" a gambling statute).

■ In construing the newspaper exemption in IC 6–2.5–5–17, the court's "foremost goal ... is to determine and give effect to the true intent of the legislature." *Johnson County Farm Bureau,* 568 N.E.2d at 580 (citing *Scheid v. State Bd. of Tax Comm'rs* (1990), Ind.Tax, 560 N.E.2d 1283,

1286). To determine the legislative intent, the court is guided by rules of construction, including the rule that exemption statutes are strictly construed against the taxpayer. *Harlan Sprague Dawley II,* 605 N.E.2d at 1225 (citing *General Motors Corp. v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 578 N.E.2d 399, 404, *aff'd,* (1992), Ind., 599 N.E.2d 588). Moreover, the term "newspaper" must not be construed beyond its "plain, ordinary and usual sense, unless such a construction is plainly repugnant to the intent of the legislature or the context of the statute." *Johnson County Farm Bureau,* 568 N.E.2d at 581 (quoting *Scheid,* 560 N.E.2d at 1286).

■ The Department, in a nutshell, argues that *Indianapolis Monthly* is a magazine—not a newspaper—and therefore is not entitled to the newspaper exemption. "[T]here is authority that the word 'newspaper,' as used in a sales tax statute, is a word of general and common usage and, as such, is to be construed in its plain and ordinary sense, and when so construed, it does not include magazines or periodicals." [11] 58 AM.JUR.2D *Newspapers, Magazines, and Other Periodicals* § 1 (1989) (footnotes omitted). The court further notes the legislatures of some states have, unlike Indiana, exempted both newspapers and magazines and/or other periodicals from sales taxes. *See* Multistate Sales Tax Guide (CCH) ¶ 947. The court may not, however, "expand or contract the meaning" of the newspaper exemption in IC 6–2.5–5–17 to include other types of publications. *Caylor–Nickel Clinic,* 569 N.E.2d at 769 (citing *Smiley v. State Dep't of Revenue* (1981), Ind.App., 416 N.E.2d 855, 856). Nor may the court " 'substitute language which it feels the legislature may

---

**10.** Using the unconstitutionality of 45 I.A.C. 2.2–5–26(b)(2) as its basis, Emmis has requested an injunction against the collection of sales tax pending the outcome of its original tax appeal. Emmis argues the remedy for unconstitutional discrimination under the regulation is to extend exemption benefits to *Indianapolis Monthly.* Suffice it to say, the presumptively valid newspaper exemption under IC 6–2.5–5–17 is dispositive in determining whether Emmis is excused from the sales tax; the Department's regulation is not.

**11.** In *Leathers* the Supreme Court held that differential taxation of different media sources is constitutionally permissible under a generally applicable, content-neutral sales tax scheme, absent censorial motives or the threat of censorship. *See Leathers,* at ——, 111 S.Ct. at 1447, 113 L.Ed.2d at 507–08 (exemption of print media from sales tax, without exempting cable television services, or cable and satellite services, permissible).

have intended.'" *Id.* (quoting *Indiana Dep't of State Revenue v. Estate of Smith* (1984), Ind.App., 460 N.E.2d 1263, 1265).

■ The court's task in construing the newspaper exemption statute according to the common meaning ascribed to the term "newspaper" is, however, frustrated by the constitutional questions permeating the case at bar. The term "newspaper" is inherently content laden. As defined in the dictionary, a "newspaper" is: "a paper that is printed and distributed daily, weekly, or at some other regular and usual short interval *and that contains news, articles of opinion (as editorials), features, advertising, or other matter regarded as of current interest."* WEBSTER'S THIRD NEW INT'L DICTIONARY 1524 (1976). *See also* 58 AM.JUR.2D, *supra*, at § 1. "[N]ot surprisingly, the cases and authorities generally indicate that news is commonly thought to be a necessary component of a newspaper." *Gallacher*, 602 A.2d at 1001 (footnote omitted). In the context of press taxation and in light of the constitutional issues at bar, however, consideration of content-based notions of what constitutes a newspaper is inappropriate.[12]

As pointed out by the dissent in *Magazine Publishers of America II*, however, "the term[ ] ... 'newspaper' [is a] word[ ] of common usage. Based upon the format and frequency of publication, any member of the general public can identify a publication as ... a newspaper ... without reference to its contents." *Magazine Publishers of America II*, 604 So.2d at 464 (Harding, J., dissenting); *see also Hearst*, 461 N.W.2d at 300–01 (distinguishing newspapers on the basis of content-neutral criteria). The court therefore construes the term "newspaper" in the context of IC 6–2.5–5–17 by considering the common content-neutral characteristics of newspapers.

■ The Department's regulation 45 I.A.C. 2.2–5–26 highlights most of the common content-neutral characteristics of newspapers, as reflected by case law and statutory law from Indiana and other states. *See generally* 58 AM.JUR.2D, *supra*, §§ 1–8. Moreover, the interpretation of the newspaper exemption found in the Department's regulation, if properly reflecting the law, is entitled to weight. *See Johnson County Farm Bureau*, 568 N.E.2d at 586 (quoting *City of Evansville v. Southern Indiana Gas & Elec. Co.* (1975), 167 Ind.App. 472, 494, 339 N.E.2d 562, 578). 45 I.A.C. 2.2–5–26(b) provides that the newspaper exemption applies only to publications: 1) commonly understood to be newspapers; 2) published at stated short intervals; 3) circulated among the general public; 4) entered or are qualified to be admitted and entered as second class mail matter at a post office in the county where published; and 5) printed for resale and are sold. The parties do not dispute that *Indianapolis Monthly* satisfies the last three requirements. Rather, they dispute whether *Indianapolis Monthly* possesses the common attributes of a newspaper and whether it is published at sufficiently short intervals.

The Department's regulation elaborates upon the common characteristics of publications that are newspapers in 45 I.A.C. 2.2–5–26(g), noting "[a] preponderance of advertising, lack of authorization to carry legal advertising, or lack of a masthead setting forth the publisher, editor, circulation, and place of publication are characteristics of publications other than newspapers." Moreover, though not addressed in 45 I.A.C. 2.2–5–26, both courts and legislatures of other states look to the type of paper on which a publication is printed.[13]

---

**12.** The parties have devoted considerable attention to establishing the facts concerning the content of *Indianapolis Monthly* in comparison to other publications. The court, having disapproved of the content-based criteria in 45 I.A.C. 2.2–5–26(b)(2), declines to embark on an analysis of the content of *Indianapolis Monthly* to determine whether it "is published for the dissemination of news of importance and of current interest to the general public, general news of the day, and information of current events."

**13.** In determining whether *Indianapolis Monthly* is a newspaper, the Department compared the type of paper used to print *Indianapolis Monthly* with the type of paper used to print the *Indianapolis Star,* which is considered a newspaper for purposes of the newspaper exemption. *Re-*

*See Hearst,* 461 N.W.2d at 300 (noting difference in paper used in printing as a factor to distinguish newspapers); *Magazine Publishers of America II,* 604 So.2d 459 (the state eschewed the recyclable nature of newsprint as a rationale for differential taxation, noting departmental regulations that stated a newspaper "is customarily printed on newsprint"); TENN.CODE ANN. § 67–6–329(a)(25) (exempting from Tennessee sales and use tax "[p]eriodicals printed entirely on newsprint or bond paper and regularly distributed on a weekly or more frequent basis").

▮ Although the foregoing characteristics are important, the frequency of publication is the foremost content-neutral factor evident in the consideration of whether a publication is a newspaper. *See* 58 AM.JUR.2D, *supra,* § 1. Publications printed less frequently than weekly are generally not considered newspapers. *See id.* at §§ 1 and 3; *Arkansas Writers' Project,* 481 U.S. at 224, n. 1, 107 S.Ct. at 1725, n. 1, 95 L.Ed.2d at 216, n. 1 (under Arkansas regulations, a newspaper is published daily, weekly, or biweekly); *Gallacher,* 602 A.2d at 1001 (newspaper published at interval not usually exceeding a week). The rationale for distinctions based on the frequency of publication is that "[a] certain infrequency of publication gives to a periodical the character of a chronicle or history, and not that of a newspaper." 58 AM.JUR.2D, *supra,* at § 3.[14] The frequency of publication standing alone, however, is not an infallible empirical measure of whether a publication is a newspaper. Accordingly, 45 I.A.C. 2.2–5–26(e) affords some flexibili-

ty in this regard: "Publications issued monthly, bimonthly, or at longer or irregular intervals are generally not considered to be newspapers."

Having established relevant content-neutral indicia of newspapers, the court now examines the undisputed material facts in the case at bar. As noted above, whether *Indianapolis Monthly* falls within the court's construction of the term "newspaper" under IC 6–2.5–5–17 is one of fact, and to obtain summary judgment, "[t]he moving party first must establish that no genuine issue of material fact exists." *Scott Oil Co. v. Indiana Dep't of State Revenue* (1992), Ind.Tax, 584 N.E.2d 1127, 1128 (citing *State v. American Motorists Ins. Co.* (1984), Ind.App., 463 N.E.2d 1142, 1145–46). If it meets this burden, "[t]he party opposing the motion then must come forward with specific facts to show that there is a genuine issue for trial." *Id.* (citing *Moll v. South Cent. Solar Sys., Inc.* (1981), Ind.App., 419 N.E.2d 154, 160). "Summary judgment cannot substitute for trial to resolve factual disputes or conflicting inferences following from undisputed facts." *Id.* (citing *C & C Oil Co. v. Indiana Dept' of State Revenue* (1991), Ind.Tax, 570 N.E.2d 1376, 1378).

As for the common content-neutral indicia of newspapers discussed above, the Department contends neither that *Indianapolis Monthly* contains a preponderance of advertising nor that it lacks a masthead setting forth relevant information about *Indianapolis Monthly.*[15] Moreover, neither party has specifically established whether *Indianapolis Monthly* is autho-

---

*spondents' Answers to Petitioner's First Set of Interrogatories* at 22(d).

**14.** Periodicals may be described in the following ways:

A periodical, as the term is ordinarily understood, is a publication appearing at stated intervals, each number of which contains a variety of original articles by different authors, devoted either to general literature, to some special branch of learning, or to a special class of subjects. Generally each number is incomplete in itself, and indicates a relation with prior or subsequent numbers of the same series....

By far the largest class of periodicals are magazines, which have been defined as pam-

phlets published periodically, containing miscellaneous papers or compositions, and as a periodical containing miscellaneous pieces....

'Magazine' as a literary term, is embraced within the meaning of the word 'periodical,' and the terms may be said to be synonymous. 58 AM.JUR.2d, *supra,* § 6. Although periodicals are characterized by their linkage to other publications in a particular series, the court notes the same may be true of publications considered to be newspapers by the Department, *e.g.,* the *Indianapolis Star.*

**15.** The *Paul Affidavit of November 2, 1992* indicates that the masthead of *Indianapolis Monthly* "occasionally" sets forth the circulation. *Paul Affidavit of November 2, 1992* at ¶ 10.

rized to carry "legal advertising"[16] as set forth in the 45 I.A.C. 2.2–5–26(g). The paper used to print *Indianapolis Monthly* does, however, differ from the paper used in other publications that receive the newspaper exemption. *Respondents' Answers to Petitioner's First Set of Interrogatories* at 22(d). *Indianapolis Monthly* also is generally published on a monthly basis. *Attachments to Emmis's Motion for Summary Judgment, Exhibit 3* at 4.

In sum, the facts established concerning relevant content-neutral characteristics give rise to conflicting inferences in determining whether *Indianapolis Monthly* is a newspaper, as contemplated by the newspaper exemption under IC 6–2.5–5–17. Though one may argue such conflicts are diaphanous, the weighing of evidentiary disputes is inappropriate in rendering summary judgment. *See Wernke v. Halas* (1992), Ind.App., 600 N.E.2d 117, 123, n. 9. The court therefore DENIES the Department's motion for summary judgment on the issue of whether *Indianapolis Monthly* is a newspaper within the terms of the newspaper exemption.[17]

### III.

### § 1983 CLAIM

In its motion for summary judgment, Emmis also contends its First Amendment rights have been violated by the Department's consideration of the criteria in 45 I.A.C. 2.2–5–26(b)(2), and that it is therefore entitled to equitable relief under 42 U.S.C. § 1983 (§ 1983).[18] Congress enacted § 1983 as "a protection [for] certain rights 'secured by the Constitution and laws' against infringement by the states. When these rights are violated, § 1983 creates an action for damages and injunctive relief...."[19] 1 S. Nahmod, *CIVIL RIGHTS AND CIVIL LIBERTIES LITIGATION: The Law of Section 1983* § 1.01 (3rd ed. 1991). Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper preceding for redress.

In the case at bar, Emmis has brought suit against both the Department and the Department's commissioner in his official capacity. The Department and its

16. 45 I.A.C. 2.2–5–26 does not define the term "legal advertising." The court notes, however, that the ability to publish "legal notices" is sometimes a factor relevant to the determination of whether a publication is a newspaper. *See* 58 AM.JUR.2D, *supra*, at § 4. Additionally, Indiana statutes recognize that "legal notices" are published in "'[n]ewspaper[s]' ... [which] means a weekly, semiweekly, triweekly, or daily newspaper...." IND.CODE 5–3–1–4(a).

17. The Department's motion for summary judgment asserts that if the court finds *Indianapolis Monthly* is not a newspaper, then the Department is entitled to judgment on several other constitutional issues, in addition to the First Amendment issue discussed above. *See* note 2, *supra*. Because a trial is required to resolve the conflicting inferences concerning whether *Indianapolis Monthly* is in fact a newspaper, however, the court leaves the remaining constitutional questions for another day.

18. The case at bar is analogous to *Arkansas Writers' Project*, in which Arkansas tax authorities examined the content of the *Arkansas Times* to determine whether it was exempt from tax.

*Arkansas Writers' Project*, 481 U.S. at 229–30, 107 S.Ct. at 1728, 95 L.Ed.2d at 219–20. The Supreme Court noted the finding of a constitutional violation in that case and remanded the matter to the Arkansas courts to consider jurisdiction over the plaintiff's § 1983 claim. *Id.* at 233–34, 107 S.Ct. at 1730, 95 L.Ed.2d at 222–23. In *Harlan Sprague Dawley, Inc. v. Indiana Department of State Revenue* (1991), Ind.Tax, 583 N.E.2d 214 (*Harlan Sprague Dawley I*), this court recognized subject matter jurisdiction over § 1983 claims.

19. To facilitate the vindication of rights through § 1983, Congress enacted 42 U.S.C. § 1988 (§ 1988), which authorizes federal and state courts to award attorney's fees. *Harlan Sprague Dawley I*, 583 N.E.2d at 222. Specifically, § 1988(b) states in relevant part that: "[i]n any action or proceeding to enforce ... [§] 1983 ... the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." Emmis also seeks attorneys' fees pursuant to § 1988.

commissioner, however, are only subject to suit under § 1983 if they are "persons" within the meaning of this statute. State agencies are not "persons" within the meaning § 1983, and Emmis, therefore, has no claim against the Department. *See Will v. Michigan Dep't of State Police* (1989), 491 U.S. 58, 70, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45, 57; *see also Bayh v. Sonnenburg* (1991), Ind., 573 N.E.2d 398, 402–03, *cert. denied,* (1992), —— U.S. ——, 112 S.Ct. 1170, 117 L.Ed.2d 415. On the other hand, Emmis's § 1983 claim for injunctive relief may lie against the Department's commissioner in his official capacity. "[A] State official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.' " *Will,* 491 U.S. at 71, n. 10, 109 S.Ct. at 2311, n. 10, 105 L.Ed.2d at 58, n. 10 (quoting *Kentucky v. Graham* (1985), 473 U.S. 159, 167, n. 14, 105 S.Ct. 3099, 3106, n. 14).[20]

As a result of the unconstitutional criteria applied under 45 I.A.C. 2.2–5–26(b)(2), Emmis contends it is entitled to injunctive relief from the continuing and future imposition of sales tax. As noted above, however, IC 6–2.5–5–17 is dispositive of whether Emmis is entitled to exemption from sales tax; the Department's regulation is not. Notwithstanding the constitutional infirmity of 45 I.A.C. 2.2–5–26(b)(2), Emmis has not shown that there has been an improper or unconstitutional denial of the newspaper exemption under IC 6–2.5–5–17. Accordingly, Emmis has not necessarily been harmed by the improper denial of the newspaper exemption. As Emmis's motion for summary judgment challenges only the constitutionality of the regulation, the court today neither decides whether Emmis is entitled to the newspaper exemption under IC 6–2.5–5–17 nor considers the constitutionality of this statute.

Furthermore, for Emmis to obtain an injunction, it must show at the very least that it lacks an adequate remedy at law for the constitutional violation arising under the Department's regulation. *See City of Los Angeles v. Lyons* (1983), 461 U.S. 95, 111, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675, 690. Section 1983 does provide an adequate legal remedy. Questions of immunity notwithstanding, § 1983 permits a suit for damages against state officials in their individual capacities.[21] *Hafer v. Melo* (1991), —— U.S. ——, ——, 112 S.Ct. 358, 365, 116 L.Ed.2d 301, 313. Accordingly, whether resulting in mere abstract harm or actual injury, the constitutional deprivation from the application of the criteria in 45 I.A.C. 2.2–5–26(b)(2) may be vindicated without enjoining the collection of sales tax. The court therefore DENIES Emmis's motion for summary judgment on its § 1983 claim.

---

**20.** In *Harlan Sprague Dawley I,* 583 N.E.2d 214, the petitioner claimed it had suffered a violation of Indiana's "ascertainable standards" rule of administrative law, *see Podgor v. Indiana University* (1978), 178 Ind.App. 245, 381 N.E.2d 1274, *trans. denied,* and in turn, a violation of § 1983. In *Harlan Sprague Dawley II,* 605 N.E.2d at 1231, the court rejected the petitioner's claim that the "ascertainable standards" rule had been violated, and therefore had no occasion to reach the distinction between individual and official capacity.

**21.** State officials in their official capacities are not subject to suits for damages under § 1983. *Will,* 491 U.S. at 70–71, 109 S.Ct. at 2311–12, 105 L.Ed.2d at 57–58.